## Case No. 9,683.

### The M. M. CALEB.

[10 Blatchf. 467.] [1]

Circuit Court, E. D. New York. Feb. 25, 1873.[2]

ADMIRALTY—MARITIME TORTS—NEGLIGENCE—TUG BOAT AND TOW—RUDDER CHAIN—TOTAL LOSS—FREIGHT.

1. A steamtug was towing two schooners lashed alongside of her, through Hell Gate. One of them, laden with coal, on freight, struck the rocks, and sank. The tug, being sued for such loss, set up in defence the arising of a violent wind, and the failure of the schooner that sank to anchor, when directed to, and the breaking of the rudder chain of the tug, and that the accident was inevitable. The libel specified no particular negligence in the tug, but alleged her negligence, generally, as causing the loss: Held, that the breaking of the rudder chain was the immediate cause of the disaster, that no excuse was shown, in respect of the violence of the wind, and that the tug was liable, the rudder chain having broken from an imperfection which might have been, and ought to have been, known.
[Cited in Bust v. Cornell Steam-boat Co., 24 Fed. 190; The Bordentown, 40 Fed. 686.]

2. The libellant sold the wreck. She was repaired by the purchaser. The actual time spent, in removing and repairing her, was thirty-one days. The commissioner, in the district court, reported, as damages, the cost of removing and repairing her, and the gross freight on the coal, for her whole voyage, and interest on those items, and an allowance for the value of the use

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirming Case No. 9,681.]

of the vessel, during the thirty-one days, which he denominated "demurrage." Exceptions, by the claimant, to the allowance of the whole freight, and of the "demurrage," were overruled by the district court. The allowance of the entire freight, not deducting anything for the time and expense incident to the completion of the voyage, was made by the commissioner, as a set-off for the time which he supposed the libellant would have consumed in arranging to raise and repair the vessel, if he had not sold her: Held, that it was correct, not to allow as for a total loss, and not to allow the value of the vessel, less the proceeds of sale, and that, therefore, it was proper to allow for the loss of the use of vessel, while she was being removed and repaired.

3. It not appearing what became of the coal, except that it was saved, the allowance of the full freight, on the principle of such set-off, was erroneous, because conjectural; and the claimant, if he desired, should be allowed to elect, whether to enquire into the disposition of the coal, and into the actual loss of freight money, (the libellant being permitted to open the question of "demurrage," with a view to increase its amount,) or to waive such enquiry and the exception as to the allowance for freight money, in which latter case, the decree below would be affirmed, with interest, without costs of appeal.
[Cited in The Thomas Melville, 31 Fed. 489.]

[Appeal from the district court of the United States for the Eastern district of New York.]
In admiralty.

Franklin A. Wilcox, for libellants.
James C. Carter, for claimant.

WOODRUFF, Circuit Judge. The libel herein alleges an undertaking by the master of the steamtug M. M. Caleb, on the 22d of November, 1870, to safely tow and pilot the schooner Baltimore, (belonging to the libellants, and then at anchor in the harbor of New York) through Hell Gate to Riker's Island; that the service was begun, and the tug, with the schooner on her port side and another on her starboard, had reached a place known as "Negro Point," when it was discovered that the Baltimore was ashore on the rocks; that, after some time, she was got off, and the tug proceeded on, and had reached a point about off the sunken marsh, on Ward's Island, when it was discovered that the Baltimore was ashore on the rocks at that point; that the master of the tug immediately threw off the lashings, saying that the tug was itself aground, and he could render no assistance; that the Baltimore settled upon the rocks, and was so broken and damaged that she became a total wreck; that she still lies there, sunken, and her fragments will not produce the sum of five hundred dollars; that, at the time the libellants' vessel was controlled by, and under the management of, the said tug and those navigating her; that the master of the tug, instead of safely towing and piloting the said vessel, as he undertook to do, so negligently and carelessly behaved, in the premises, as to cause said damages; and that the said damages are, in no way, the fault of, nor were they caused by, the libellants, or their agents, but "were solely the fault of, and caused by, the negligent acts

of those navigating the said tug M. M. Caleb." The libel also states, that the Baltimore had on board a cargo of coal, received at Philadelphia, to be transported to Boston, for an agreed freight, amounting to six hundred and eighteen $80/100$ dollars; that the Baltimore was of the value of six thousand five hundred dollars; and that the damages are the sum of six thousand dollars, for the vessel, besides the loss of the said freight, amounting to six thousand six hundred and eighteen $80/100$ dollars, besides interest.

The answer admits that the steamtug agreed to render her services in towing the Baltimore through Hell Gate, and took her in tow for that purpose. It alleges the commencement of a violent wind from the east, when opposite Astoria, which continually increased; that, when opposite Negro Point, the tug was unable to tow the two vessels, with the wind and tide as they then were, and her master requested both of the schooners to anchor; that those on board the starboard vessel did so, but those on the Baltimore neglected to comply with the request; that the anchor of the one schooner would not hold the tow, and they drifted towards the shore, till the Baltimore touched bottom; that the tug then separated from both, took the other vessel to a place of safety, then returned, drew off the Baltimore, and was proceeding with her towards a safe anchorage, when the rudder chain on the port side of the tug parted, and the tug became thereby unmanageable, and both drifted upon the sunken marsh on Randall's Island; that the disaster was not caused by any careless, negligent, or unseamanlike act or conduct of those on board of the tug, or any of them, or because of any weakness or unseaworthiness in her, or by any means which it was possible for those on board of her to prevent; but, that the same was caused, solely, by the negligent, improper, and unseamanlike conduct of those on board of said schooner Baltimore, in omitting to cast her anchors when requested to do so by those on board the tug, and by inevitable accident.

In the district court, the libellants had a decree for their damages [Case No. 9,681], and it appeared, on an inquiry into the amount, that the libellants sold the wreck, on the recommendation of the port wardens, after they had made an official survey thereof, and she brought the sum of seven hundred and thirty dollars, at public auction. She was taken off the rocks by the purchasers, her coal was taken out, and she was again sold. The purchasers at this second sale repaired her. The time actually spent in her removal, and in the actual making of repairs, was ascertained to be thirty-one days. The commissioner reported, as damages, the cost of removing her from the rocks, the cost of making the repairs, (including towage to the place of repair,) the whole amount of freight, above stated, and interest on these items, and, also, an allowance for the value

of the use of the vessel during the thirty-one days actually spent in her removal and repairs, which he denominated demurrage. On exceptions to the allowance of the whole freight, and to the allowance thus called demurrage, the district court overruled the exceptions. From the decree thereupon this appeal is taken.

The ground upon which the decision proceeded in the court below as appears by the opinion of the district judge, was, that the breaking of the rudder chain of the tug was the cause of the wrecking of the schooner; that the breaking of that chain was owing to a palpable defect in the chain itself, the same being worn, weak, and insufficient; that this was known to the claimant, when he took the libellants' schooner in tow; and that it was manifest negligence to attempt to tow the libellants' schooner with such a chain.

In the report of the damages, the commissioner gives a reason for allowing to the libellants the full freight money, as follows: "As to demurrage, I take into account only the time when the work of raising the vessel, and of making the repairs at Lissenden's yard, was actually being proceeded with, namely, thirty-one days. Some additional time would, of necessity, have been consumed in arranging for this work, if the libellants had undertaken to raise and repair the vessel, and, to offset, I have allowed the entire freight, without any deduction for the time and expense which would have been incident to the completion of the voyage."

The facts upon which the conclusion of the court below was based are, I think, clearly established by the evidence. Even taking the narrative given in the answer of the claimant herein, the breaking of the rudder chain was the immediate cause of the disaster; and it is, also, plain, I think, that the wind which the tug encountered was not of such unusual or extraordinary violence as to excuse her. It was not an exigency which ordinary care and prudence did not require her to be prepared to meet, before she assumed the duty of conducting two other vessels through a difficult and dangerous passage such as Hell Gate; and, moreover, there is great force in the argument of the libellants, that if the gale was of so extraordinary a character as to form any excuse to her, then it was negligence and improper management in her not to seek shelter and safety before entering that channel, which she might easily have done. I think, also, the proof establishes that the chain was worn, weak, and insufficient for the service; and that the master of the tug had such knowledge of its condition as makes him chargeable with negligence in relying upon it. Besides, it was his duty to know it, when the defect was apparent on inspection, as it is proved it was. The claimant, however, insists, that, as this defect in the chain was not specified in the libel as a cause of the disaster, the evidence on that subject should be disregarded. The

charge of negligence is, in the libel, very general. I think, that, if the libel had been excepted to, for want of proper specifications, such exception would have been sustained, and, had it been made specific without mention of the use of an insufficient rudder chain, the case of McKinlay v. Morrish, 21 How. [62 U. S.] 343, would have gone very far to sustain the position of the counsel for the claimant here. But, even then, the neglect of the tug to come to anchor below would have been a serious hindrance to the exoneration of the tug.

The proof fails, wholly, to establish the only defences which are set up in the answer. The accident was not inevitable. Any attempt to urge that is met, at once, by the admission, that the rudder chain broke, and by the proof of its imperfection. The charge of negligence in the schooner rests solely on the statement that she was requested to anchor and neglected to do so. The proof makes it doubtful whether any such request was made, or attempted to be communicated to the Baltimore, and it shows, at least, that no such request was heard or understood by those on board the Baltimore.

The amount awarded for damages to the schooner was properly ascertained without reference to the value of the vessel, or the price for which the wreck was sold. There was no sufficient, proper evidence which would justify the libellants in claiming for a total loss; and, not having appealed from the decree, the libellants are concluded upon that question. On the other hand, the claimant not having excepted to the mode of ascertainment, nor to the amount allowed, it is not open to him to object thereto, on the appeal. In fact, as the amount is much less than would be awarded on the basis of a total loss, or a loss of the value of the vessel, less the proceeds of sale, it was not for the interest of the claimant to object thereto. The mode of ascertainment was, however, upon the evidence, correct, and it is material so to declare, because it bears upon the exception to the allowance for the use of the vessel during the time necessary for her removal from the rocks, and for the repairing of her injuries. Having been, in fact, removed and repaired, it was just to hold, that the vessel bound to make indemnity for the injury was in no worse condition than if the libellants had removed and repaired her; and, on the other hand, if the offending tug was not liable for the full value of the vessel, less the proceeds of the sale, then, surely, to ascertain their loss, it was competent to show the necessary cost of removing and repairing; and this, whether it was done or not, and by whomsoever done, was, at least, a just measure of the damage to the vessel, sustained by the injury. Hence, the enquiry on this point properly proceeded as if the libellants had themselves removed and repaired the vessel, and the fact of a sale became wholly immaterial. It necessarily follows, that an allow-

ance for the loss of the use of the vessel during the time reasonably necessary for such removal and repairs, became a proper element in the assessment of the loss. Denying to the libellants the value of the vessel, they could not otherwise be indemnified. The exception to such allowance was, therefore, properly overruled.

The claimant also excepted to the allowance of the full freight which would have been earned by the completion of the voyage and the delivery of her cargo; and, on that subject, there is some embarrassment. The proofs do not show what became of the cargo. It was proved, that the coal was taken out of the schooner, but what was done with it does not appear. Did the owners of the cargo accept it, when taken out of the schooner, and so become liable for freight pro rata itineris? Or, did the libellants send on the cargo by some other vessel, and so become entitled to full freight? Or, was the cargo detained until after the schooner was removed and repaired, and (treating the libellants, as between them and the owners of the tug, as still having the control of the schooner,) might they have reladen the cargo, and proceeded on the voyage, and made delivery thereof, and received full freight? Upon these questions, no information is furnished, by the proofs. I greatly doubt, that further enquiry on this subject will be of any benefit to the claimants of the tug; but, I fail to see the propriety of what seems, in the report of the commissioner, a conjecture, that what he might properly have allowed as further necessary time of detention for preparation for removing the schooner, is equal to any sum which could have been saved out of the freight money, by sending or carrying the coal to Boston, and that there might be a set-off based on that conjecture. There was no such proof. Non constat that the libellants did not receive freight. Non constat that they did not send on the cargo, as, I think, it was their duty to do, if practicable, and receive therefor full freight, in which case their necessary expenses of sending and delivering would represent their loss of freight. While, therefore, I am of opinion that the decree below was correct, in all respects, except in the matter of this set-off, I am compelled to say, that, if the claimant desires a further enquiry into the actual disposition made of the cargo, and into the saving which the libellants did make, or, in the due discharge of their duty might have made, out of the freight money, (permitting the libellants, at the same time, to open the question of allowance in the nature of demurrage,) he may have a reference to the commissioner, to ascertain the further facts, and to determine thereupon the actual loss of freight by the disaster, and whether any and how much further loss is due to the greater time of detention for repairs, if any competent proof can be given showing that the allowance already made is not adequate. If the claimant should

not desire such a reference, and shall, within twenty days, file his waiver thereof, and of his exception in respect to the allowance for freight, then, let the libellants have a decree for the amount awarded by the decree appealed from, with interest, without costs of this appeal. If no such waiver is filed, let an order of reference be entered. A preliminary or interlocutory order, in conformity with these directions, may be entered.